**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MEDIA ALLIANCE, INC. and STEPHEN C.**
**PIERCE,**

                                        **Plaintiffs,**

              **vs.**                                          **1:09-CV-0659**
                                                              **(MAD/RFT)**

**ROBERT MIRCH, Commissioner of Public Works**
**for the City of Troy, individually and in his official**
**capacity, and the CITY OF TROY;**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

O'CONNELL and ARONOWITZ              Charles C. Dunham IV, Esq.
54 State Street                     Neil H. Rivchin, Esq.
9th Floor
Albany, New York 12207
*Attorneys for Plaintiffs*

DREYER BOYAJIAN LLP                 John B. Casey, Esq.
75 Columbia Street
Albany, New York 122210
*Attorneys for Defendants*

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

        Plaintiffs Media Alliance, Inc. ("Media Alliance") and Stephen C. Pierce ("Pierce") bring

this action pursuant to 42 U.S.C. § 1983 and allege that defendants violated their First

Amendment right to free speech and peaceable assembly and their Fifth and Fourteenth

Amendment rights to Due Process and Equal Protection. Plaintiffs also allege that defendants

violated provisions of the New York State Constitution and allege the state law tort claim of

abuse of process and/or government power.

## FACTS AND BACKGROUND[1]

Media Alliance, Inc., a not-for-profit corporation, owns and operates The Sanctuary for Independent Media ("Sanctuary") located at 3361 6th Avenue, Troy, New York.  Most members of the Board of Directors of Media Alliance, including Pierce (the executor director) and his wife, Branda Miller, were Arts professors at Rensselaer Polytechnic Institute ("RPI").  The Sanctuary offers a venue for artistic and political expression.

Building Permit and Classification of Use

Prior to Media Alliance's occupancy, the 6th Avenue building was used as a church and a puppet theater.  In July 2005, plaintiffs applied to the Bureau of Code Enforcement for a building permit for the property.  In the building permit application, plaintiffs proposed, "to convert an existing church into a media broadcast/production facility for film video and audio.  Minor repair, missing ceiling tiles, touch up painting, etc.  Same layout".   In August 2005, the Zoning Board of Appeals granted a special use permit for a change of non-conforming use to allow conversion of the former church into a media production studio.  In August 2005, the Planning Board approved, with certain stipulations, plaintiffs' proposal to convert the church into a media production

---

[1] The facts set forth in this section are taken from: (1) the Amended Complaint; (2) the Answer; (3) Defendants' Statement of Material Facts; (4) Plaintiff's Response to Defendants' Statement of Material Facts; (5) the exhibits and evidence submitted by Defendants in support of their Motion for Summary Judgment; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment.  The Court has reviewed defendants' Statements of Material Facts to ensure that it is supported by the record.  The Court notes that plaintiff also submitted additional "facts".  To the extent that the "facts" are supported by the record, the Court will consider them in the context of the within motion.  The facts, as discussed herein, are for the relevant time period as referenced in the amended complaint.

studio.[2]  Russ Reeves, the Executive Secretary of the Planning Board and City Engineer, communicated these stipulations and the approval in a letter to Pierce.

At the relevant time, Don Albano was the Building Plans Examiner in the Bureau of Code Enforcement.  Albano testified about the process for reviewing proposals and plans.  Albano testified that he would review the construction documents and determine the classification of use pursuant to the New York State Building Code.  If Albano was satisfied that the construction would be in compliance with the building code, a permit was issued.  Once the work was started, the applicant was required to call for an inspection.  After the inspector "signed off" on the job, a Certificate of Occupancy was issued (if required) provided the applicant complied with the zoning and planning board stipulations.

With respect to plaintiffs' proposal, Albano testified that he reviewed the plans and requested an opinion from plaintiff's architect, Joe Fama of Troy Architectural Program ("TAP") regarding the proper classification of use for the building.  Chapter K-8 of the Building Code provided the following classifications for assembly uses:

> A-1 is assembly uses, usually with fixed seating, intended for the production and viewing of the performance arts or motion pictures including, but not limited to:
>
> Motion pictures theaters
> Symphony and Concert Halls
> Television and radio studios admitting an audience
> Theaters.

---

[2] The relevant stipulations were:

1.  The applicant shall scrape, prime, and pain the building as necessary, including north and south sides of the building;
2.  Applicant shall repair or replace existing freestanding sign.
4.  Applicant shall submit proposed signage to be reviewed and approved by the Planning Department prior to installation.  Signs shall be dark background with light lettering and shall be professionally made and installed.

A-3 Assembly uses intended for worship, recreation or amusement
and other assembly uses not classified elsewhere in Group A,
including but not limited to:

Amusement arcades
Art galleries
Bowling alleys
Churches
Community halls.

On September 22, 2005, Mr. Fama provided a written opinion stating that the proposed

use involved no change in occupancy, therefore the Sanctuary should remain an A-3

classification. Albano accepted that opinion. On September 28, 2005, Albano issued a building

permit and on September 28, 2005, Terry DuBois, the Director of the Bureau of Code

Enforcement, issued a Certificate of Occupancy to Pierce for the Sanctuary. The Certificate

indicated that the Sanctuary may be occupied and used as a Media Facility provided that plaintiff

completed Stipulations 1, 2 and 4 previously addressed by the planning committee by June 30,

2006.[3] On October 4, 2006, after the planning board stipulations were satisfied, DuBois issued a

replacement Certificate of Occupancy.

On or about January 2007, Albano contacted Pierce to schedule an inspection of the

Sanctuary.[4] On January 10, 2007, Albano and Assistant Fire Chief Tom Adams conducted an

inspection of the Sanctuary while Pierce was present. Asst. Fire Chief Adams was concerned

with the exits and specifically, the fact that the front doors did not swing out. Adams described

this as a "safety concern".

On January 17, 2007, Albano sent Pierce a letter outlining the results of the inspection:

---

[3] The Certificate of Occupancy contains a handwritten note, with initials, indicating that this date may have been extended until October 2, 2006. The parties do not address that notation.

[4] The parties present different explanations regarding why or how the need for this inspection arose.

4

I have done a code analysis on the basement and 1st floor plans in regards to egress.  The existing door widths and swing directions were noted on the site visited [sic] conducted on 1/10/07 with Tom Adams - Troy Fire Department.  What follows are the requirements of NYSBC Appendix K 801.11.1.  I have included copies of the floor plans with my mark ups and calculations.  A future site visit will be arranged at your convenience.  Your continued cooperation is greatly appreciated.

1) The front double doors must swing out of the building.
2) The existing 30" door in the rear of the 1st floor must be increased to at least 32" in width.
3) The existing 29" door in the rear of the basement must be increased to at least 32" in width;
4) All exterior doors which are capable of being locked or latched must be retro fitted with panic and fire exist hardware.
5) Please remove all combustible tapestries from the 1st floor rear office and lounge area.
6) Please ensure all fire extinguishers are inspected and certified.
7) Please have the existing fire alarm system inspected and certified.
8) Please ensure all illuminated exit signs and emergency back up lighting are in working order.

In February 2007, Pierce sent Albano two emails providing information regarding plaintiffs' efforts to address the issues presented in Albano's January 2007 correspondence.  On October 8, 2007, Pierce sent a letter to Albano indicating that plaintiffs intended to replace the front double doors so they would swing out of the building.  In addition, plaintiffs intended to replace hardware on the front doors with panic and fire exit hardware.  As of March 10, 2008, the front double doors did not swing out of the building, the rear door was not increased, the basement door was not increased and the exit doors were not retrofitted with panic and exit hardware.

<u>Bilal Exhibit</u>

On March 5, 2008, Wafaa Bilal, a visiting artist from the Art Institute of Chicago, lectured on the RPI campus and exhibited a video game installation entitled "Virtual Jihadi: A Night of

Bush Capturing".[5]  In Bilal's game, an Iraqi becomes a terrorist suicide bomber on a mission to assassinate President Bush. RPI was scheduled to display Bilal's game but RPI's President closed the exhibit due to controversy.  On March 6, 2008, Pierce extended an invitation to Bilal to lecture and exhibit "Virtual Jihadi" at the Sanctuary.  Bilal accepted the invitation and on March 7, 2008, plaintiffs issued a press release and flyer publicizing Bilal's appearance which was scheduled for March 10, 2008.  Bilal was scheduled to return to Chicago on March 11, 2008. Plaintiffs claim that the March 10th lecture was an "opening lecture" and that after the lecture, plaintiffs intended to display the game for a few hours, during lunchtime, for one week. Defendants claim that they did not know that plaintiffs intended to display the installation after Bilal's March 10th event.

On March 7, 2008, defendant Robert Mirch ("Mirch"), the Majority Leader of the Rensselaer County Legislature and Commissioner of Public Works for the City of Troy, issued a press release stating that, "he is disgusted that a Troy organization would agree to host an exhibition that includes the portrayal of a suicide bomber sent to assassinate the President" and that, "he is organizing a protest of the Virtual Jihadi exhibition scheduled for the Sanctuary for Independent Media in Troy for Monday night at 5:30 p.m."

Several key events took place on March 10, 2008.  In the morning, Branda Miller met with Troy Chief of Police Nicholas Kaiser.  Ms. Miller asked for police protection for the event that night.  Also in the morning, Pierce testified that Albano called him to advise that he would be inspecting the building "right now".   Later in the day, Bilal was a guest on Al Roney's radio talk show on 810 WGY and Mirch called in to the show to debate Bilal.  Also during that day, Reeves

---

[5] The Virtual Jihadi is a parody of a commercial video game entitled "Quest for Saddam".  In that game, players target Saddam Hussein.  The original game was hacked by an organization related to Al Qaeda and in the hacked version, the face of Saddam was replaced by President Bush. In Bilal's version, the artist plays the role of a suicide bomber on a quest to locate and assassinate President Bush.

met with Albano and a member of the Fire Department to discuss concerns for potential danger at the event that evening.   Sometime later in the day, Albano and Adams conducted an  inspection of the Sanctuary building.  Upon inspection, Albano and Adams found that four items concerning the doors, previously identified in the inspection 14 months earlier, had not been corrected. Albano told Pierce that he found code violations.  Adams allowed plaintiffs to hold the event provided the doors were left open during the show.  That evening, Bilal gave a two hour lecture and exhibited the "Virtual Jihadi" installation in the Sanctuary.  Approximately 120 - 150 people attended the event.  Pierce left the front double doors open during the event.  Approximately 50 protestors, led by Mirch, picketed outside.  The City of Troy provided uniformed and plainclothes police officers.

Events after Bilal's Lecture

On March 11, 2008, Bilal returned to Chicago but left his Virtual Jihadi installation at the Sanctuary.  On March 11, 2008, Dave Sheeran, a code enforcement employee, called Pierce and advised that no further public assembly would be allowed at the Sanctuary until the four items concerning the doors were completed.  Albano and Reeves also notified Pierce.  On March 11, 2008, the Bureau of Code Enforcement issued a Notice of Violation stating, "[t]he building shall not be used as a place of assembly until the previous four items are corrected".

On March 12, 2008, Reeves sent a letter to Pierce concerning the life safety issues and provided a copy of Albano's March 10th inspection report.  Pierce was advised that the Virtual Jihadi could be displayed at another venue within the City while the Sanctuary doors were being replaced.   However, Pierce testified that plaintiffs were unable to find an alternate location for the Bilal exhibit because people were frightened to display the installation for fear of retaliation by the City.

One week later, Pierce and other Media Alliance board members protested outside Troy City Hall.  On April 23, 2008, Albano and Reeves inspected the building.  All of the violations identified were corrected and therefore, the Sanctuary was open for public assembly.

Defendants move for summary judgment and dismissal of plaintiffs' complaint, in its entirety. (Dkt. No. 33).  Plaintiffs oppose defendants' motion. (Dkt. No. 41).

## DISCUSSION

### I.      Standard on Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).  A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See id*.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712,

716 (2d Cir. 1994).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

## II.      Section 1983

Section 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws".  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (citing 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights.  *Id.* (internal citations omitted) (holding that § 1983 provides a method for vindicating federal rights elsewhere conferred).  In order to recover damages under 42 U.S.C. § 1983, a plaintiff must show that (1) "the conduct complained of was committed by a person acting under color of state law," and (2) "this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 29 -30 (2d Cir. 1996).  Here, plaintiffs claim that defendants violated their rights under the First, Fifth and Fourteenth Amendments.

## III.     First Amendment Retaliation

To prevail on a free speech claim, a private citizen must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment rights.  *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

9

Defendants agree that plaintiffs interests are protected by the First Amendment.

A.     **Defendants' Motivation**

To establish this element, plaintiff must provide specific proof of defendants' improper motivation with either circumstantial or direct evidence. *Id*. at 73. An example of direct evidence are comments by defendants. *Abel v. Morabito*, 2009 WL 321007, at *2 (S.D.N.Y. 2009) (citation omitted) (the plaintiff testified that the Town Attorney told him, in the defendant's office that, "If you don't stop, we are going to get you"). Circumstantial evidence includes close temporal proximity between plaintiff's speech and the alleged retaliatory act. *Id*. (the plaintiff published a column from 2003 through 2004 and the alleged retaliatory conduct occurred at the end of that time period); *see also Agostino v. Simpson*, 2008 WL 4906140, at *7 (S.D.N.Y. 2008). Evidence that an "impermissible reason (i.e., retaliation) was at least part of the basis for the defendant's actions precludes summary judgment in the defendant's favor unless they can establish that they, would have taken the same adverse action even if the impermissible reason had not existed". *Abel*, 2009 WL 321007, at *3 (citing *Greenwich Citizens Comm.*, 77 F.3d at 31).

Defendants argue that they acted out of concern for public safety and that they were unaware until March 10, 2008 that plaintiffs had not replaced the front doors. Defendants claim they would have taken the same action regardless of the Bilal event once they realized that the exit doors were not replaced and large assemblies were being held. Moreover, defendants claim any inference of retaliation is negated by the fact that the building was inspected 14 months earlier and plaintiffs were aware of the necessary changes for code compliance. Conversely, plaintiffs argue that the close temporal proximity between the protected activity and Sanctuary closure supports their claim that defendants were motivated by opposition to the exhibit.

10

Plaintiffs describe the timeline as follows: On the morning of the Bilal event, Mirch voiced his opposition to the exhibit on the radio.  On the same morning, several employees of the Bureau of Code Enforcement met to discuss inspecting the building and shortly thereafter, Albano conducted an unannounced inspection and verbally informed Pierce of code violations.  The next morning, Sheeran told Pierce that the Sanctuary was closed for public assembly.   Plaintiffs claim that this sequence of events establishes defendants' improper motivation.

Viewing the evidence in a light most favorable to plaintiffs, the Court finds that there is a genuine factual dispute regarding defendants' motivation.  The record reveals that plaintiffs initially received a Certificate of Occupancy in October 2006 after plaintiffs complied with planning board stipulations.  In January 2007, defendants conducted an unannounced inspection of the premises and issued a letter advising plaintiffs that they should address eight requirements of the Building Code.  Defendants did not inspect the building again until 14 months later, the day of the Bilal event.  While defendants allege that the building was not code compliant on March 10, 2008, defendants did not act upon the alleged violations, which were present 14 months before the event, until the day after the event.  The alleged retaliatory act (closing the building) occurred one day after the protected activity (the Bilal event).  Thus, there is evidence that a retaliatory motive was at least part of the reason for defendants' action.

### B.    Chilled Speech

Even assuming plaintiffs can establish the first two elements, plaintiffs must prove that their First Amendment rights have been chilled.  "The Supreme Court has held that 'allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm'".  *Curley*, 268 F.3d at 73 (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)).  "The requirement of 'actual chilling' ensures an identified injury to one's right to free

speech is established.  Hurt feelings or a bruised ego are not by themselves the stuff of

constitutional tort".  *Zherka v. Amicone*, 634 F.3d 642, 645-46 (2d Cir. 2011).  The plaintiff must

demonstrate that the retaliatory conduct either silenced them or had some actual chilling effect on

their speech.  *Williams v. Town of Greenbush*, 535 F.3d 71, 78 (2d Cir. 2008); *see also Casciani*

*v. Nesbitt*, 659 F.Supp.2d 427, 458-61 (W.D.N.Y. 2009) (the plaintiff was required to show more

than a change in behavior, he had to establish that the defendants intended to, and did, prevent or

deter him from exercising his rights under the First Amendment).  Where a party can show no

change in his behavior, he has failed to show any chilling of his First Amendment right to free

speech.  *Id*. (the plaintiff continued to campaign for village trustee even after he was arrested)*;*

*see also Curley*, 268 F.3d at 73.  The issue is whether a jury could reasonably find that the

plaintiff's behavior did, in fact, change due to the defendant's conduct.  *Abel*, 2009 WL 321007,

at *4.

Plaintiffs claim that their speech was chilled because they were prevented from displaying

Bilal's installation for a period of time after the initial event due to defendants' actions.  Further,

plaintiffs claim that after the Sanctuary was closed, they were unable to exhibit the work because

no other venue was willing to present the exhibit for fear of retaliation from defendants.

Defendants claim that plaintiffs held the Bilal exhibit as planned and that after the Sanctuary was

closed, all scheduled events were held at other locations.  Defendants also claim they were

unaware that plaintiffs intended to continue exhibiting the video installation after Bilal's lecture

on March 10th.

The evidence in the record belies plaintiffs' claims.  While plaintiffs may have "intended"

to display Bilal's work after the lecture, plaintiffs provide only vague, self-serving testimony to

support that assertion.  Plaintiffs failed to provide any evidence establishing a schedule for the

continued display of the installation.  Neither Miller nor Pierce could testify, with any specificity, about any plan to display the installation at the Sanctuary beyond the evening of Bilal's event. Miller stated, "I don't remember the details. I don't think it was that long.  It was just to let people see the installation".  Moreover, the admission was deemed a "donation".  Pierce testified:

> Q.    After the event on the 10th, what was your plan for the virtual Jihadi video game at your facility?
>
> A.    Well, we didn't anticipate that a lot of people were going to come to the exhibit, certainly not from all the publicity.  But we wanted to make a statement that we were not going to be intimidated and we weren't going to allow Bilal's work made inaccessible to the public.  So we figured out a way to do it that wouldn't be an undue burden on us, because we don't have a lot of staff.  So I think we decided we would have it open during lunchtime so that people who work could get off and come and see it if they wanted, but for a very limited amount of time, maybe eleven to one, something like that, Tuesday through Friday, just for the week.[6]

The record contains no evidence, affidavits or other documentation supporting plaintiffs' claim that the installation was to be displayed beyond March 10th.  Moreover, even assuming plaintiffs intended to display the work, there is no evidence that defendants' had any knowledge of that intention.  To wit, plaintiffs issued a press release and publicized Bilal's lecture on March 10th but the record contains no such documentation regarding the continued display of the exhibit. Plaintiffs' conclusory, speculative assertions are insufficient to demonstrate that there was an actual chilling of their speech.

---

[6] In plaintiffs' supplemental submission (Dkt. No. 45), plaintiffs claim, for the first time:

> Plaintiffs scheduled the "Virtual Jihadi" exhibit to run from March 11, through April 4, 2008, with an opening lecture featuring Bilal on the evening of March 10, 2008.

The record does not support this allegation.

Moreover, plaintiffs failed to provide any admissible evidence to establish that defendants silenced them because plaintiffs failed to come forward with any evidence establishing that no other venue would host the installation due to fear of retaliation.  Plaintiffs failed to provide even basic information including the names of the facility or venue that allegedly rejected their request to display the installation.

Accordingly, even assuming plaintiffs could establish that defendants intended to interfere with their First Amendment rights, there is no evidence of actual "chilling" of plaintiffs' speech. *See Spear v. Town of West Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (allegations of a chill that are conclusory and speculative will not suffice).  Plaintiffs fail to demonstrate any change in their behavior as a result of defendants' conduct.  Indeed, plaintiffs admit that within one week of the Sanctuary closing, plaintiffs protested the issue of their freedom of speech outside of the old City Hall.  Defendants' motion for summary judgment and dismissal of plaintiff's First Amendment retaliation claims is granted.[7]

## IV.     Equal Protection

Defendants argue that plaintiffs were not treated differently than similarly situated persons.  Defendants argue that the complaint actually suggests that plaintiffs were treated similarly as others who expressed political and social views at odds with defendants.  Plaintiffs claim "selective enforcement" and argue that their unequal treatment is evidenced by the fact that many facilities in the area had exit doors that opened inward.

---

[7] Defendants moved, in the alternative, for summary judgment dismissing plaintiff's First Amendment retaliation claim against Mirch due to no personal involvement.  Based upon this Court's decision, that argument is moot.

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike". *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim based on a theory of selective enforcement, plaintiffs must show both (1) that they were treated differently from other similarly situated businesses and (2) that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007).

"[A]t the summary judgment stage, a 'plaintiff must present evidence comparing [himself] to individuals that are similarly situated in all material respects'". *Mangino v. Inc. Vill. of Patchogue*, 739 F.Supp.2d 205, 253 (E.D.N.Y. 2010) (the plaintiff alleged that other residents who were issued tickets continued to not comply with the law but, on summary judgment, failed to identify such residents); *see also Manbeck v. Micka*, 640 F.Supp.2d 351, 399 (S.D.N.Y. 2009) (the plaintiff offered nothing more than sheer conjecture and speculation as she failed to identify other persons who sought the same type of permit for the same type of land and how the plaintiff was either similar or different from them).

Here, faced with a motion for summary judgment, plaintiffs failed to identify any similarly situated facilities or organizations that defendants treated differently.  Plaintiffs vaguely state, "multiple facilities in which the plaintiffs were forced to seek refuge, until defendants lifted the closure order in order to host their scheduled events, all had exit doors that opened inward". Again, plaintiffs fail to identify any facility by name or provide any other evidence to support this statement.  Thus, plaintiffs failed to meet their burden of proof on this issue.  As plaintiff has not

satisfied the first prong of the selective enforcement test, plaintiff's equal protection claims are dismissed.

## V.    Due Process[8]

Plaintiffs allege that defendants violated their due process rights under the Fifth and Fourteenth Amendments.[9]  The complaint asserts the following:

> The Defendants' actions, under color of state law, violated the Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution by misusing the local building codes to close the Sanctuary in retaliation for Plaintiffs' exercise of their constitutional rights.[10]

Pltf. Am. Cmplt. (paragraph number omitted).

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under the Due Process Clause, "[a] plaintiff may bring suit under § 1983 for state officials' violation of his rights to, e.g., freedom of speech". *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Further, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Id.*  In order to demonstrate a violation of either substantive or procedural due process rights, the plaintiff must first demonstrate the possession of a federally protected property right to

---

[8] In the original motion and opposition papers, the parties failed to address this issue in a manner that would enable the Court to conduct a meaningful analysis.  Thus, the Court directed the parties to provide supplemental submissions and appear for oral argument regarding this claim.

[9] The Fifth Amendment Due Process Clause applies only to federal actors and is thus inapplicable to this case.  *Schafer v. Hicksville Union Free Sch.Dist.*, 2011 WL 1322903, at* 7 (E.D.N.Y. 2011).

[10] During oral argument, plaintiffs' counsel withdrew the allegations contained in Paragraph 65 of the Amended Complaint.

the relief sought.  *Puckett v. City of Glen Cove*, 631 F.Supp. 226, 236 (E.D.N.Y. 2009) (citing *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)).

### A.    Procedural Due Process

Plaintiffs claim that their protected interest was the right to use the property as a continued A-3 Assembly classification.  Plaintiffs further argue that defendants deprived plaintiffs of due process of law when they closed the building: (1) without notice; (2) without a hearing; and (3) without addressing the "grandfathering" issue.  Plaintiffs also allege that there was no life threatening situation to warrant defendants' conduct.

A procedural due process inquiry entails two elements: 1) whether there a constitutionally protected property or liberty interest; and 2) whether the process afforded was adequate.  *Rotundo v. Vill. of Yorkville*, 2011 WL 838892, at *8 (N.D.N.Y. 2011) (citing *Ford Motor Credit Co. v. N.Y.C. Police Dep't*, 503 F.3d 186, 191 (2d Cir.2007)).  Whether a protectable property interest exists is a question of state law.  *Gavlak v. Town of Somers*, 2005 WL 1828750, at *3 (D. Conn. 2005) (a nonconforming use is a vested property right in the state of Connecticut.  In New York, it is well established that a nonconforming use that predates the enactment of a restrictive zoning ordinance is a vested right entitled to constitutional protection. *Norton v. Town of Islip*, 239 F.Supp.2d 264, 270 (E.D.N.Y. 2003) (citing *Town of Somers v. Camarco*, 308 N.Y. 537, 541 (N.Y. 1955)); *see also Keller v. Haller*, 226 A.D.2d 639, 641 N.Y.S.2d 380 (2d Dep't 1996).  Assuming plaintiffs had a protected property interest in continuing to operate the Sanctuary as an A-3 Assembly use, plaintiffs' must establish that they were deprived of that property interest without due process of law.

Notice is sufficient if it is reasonably calculated under all circumstances to apprise interested parties of the pendency of an action and afford them opportunities to be heard. *Ludwig v. City of Jamestown, N.Y.*, 518 F.Supp.2d 484, 498-501 (W.D.N.Y. 2007).   The degree of formality of notice depends on the situation at hand. *Id.*  The Supreme Court has articulated the factors to be considered by courts in determining whether a government deprivation of an individual's property violates due process as follows: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976)).  Government officials retain wide discretion about enforcement decisions. *Schubert v. City of Rye*, 2011 WL 1326039, at *11 (S.D.N.Y. 2011) (citing *Young v. Town of Huntington*, 121 A.D.2d 641 (1986)) (the decision to enforce land use codes rests in the discretion of the public officials charged with enforcement).

Here, plaintiffs allege that while defendants conducted inspections and sent letters regarding the alleged building code issues, plaintiffs never received a formal Notice of Violation and simultaneous closure of the Sanctuary for public assembly on March 12, 2008.  As such, plaintiffs did not have an opportunity to object at a hearing or a reasonable time to repair or remedy the situation.  Defendants claim that plaintiffs had ample notice of the violations and an opportunity to object to the findings and remedy the conditions as early as January 2007.  The Court has reviewed the record and finds that there is a genuine issue of fact regarding notice and therefore, the matter is an issue for a jury to consider.  Notably, Albano's January 2007 letter was not a Notice of Violation.  The letter is devoid of any language or information regarding any

18

procedures by which plaintiffs could object to the findings and did not contain any threat of closure if the conditions were not remediated.  *See Ludwig*, 518 F.Supp.2d at 501 (notice without such language was insufficient as required for due process).   Defendants concede that they were somewhat informal in their approach to the issues and perhaps should have applied more pressure upon plaintiffs to correct the violations.  However, defendants argue that despite the informality, the record establishes that plaintiffs had notice of the issues and could have requested a hearing or voice objections.  The Court is unpersuaded by this argument.  Indeed, the informal nature of defendants letters/requests for remediation coupled with the lengthy period of time between the issuance of the Certificate of Occupancy (October 2006), the January 2007 inspection and then the March 10, 2008 reinspection, could lead a reasonable jury to conclude that defendants acquiesced to the conditions as they existed.

With respect to the emergency situation, "[i]t has long been recognized, however, that authorized agents may proceed without providing pre-deprivation hearings when an emergency situation necessitates quick action or makes it impracticable to provide a meaningful hearing, so long as the State provides 'some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.' " *Catanzaro v. Weiden*, 140 F.3d 91 (2d Cir. 1998) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)).  "Where a deprivation of property is involved, the aggrieved individual must be given 'an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event'". *Burtnieks v. New York*, 716 F.2d 982, 987 (2d Cir. 1983) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).   The issue of whether an emergency existed is an issue of fact for a jury and improperly decided on a motion for summary judgment.  *DeBari v. Town of Middleton*, 9

F.Supp.2d 156, 162 (N.D.N.Y. 1998) (citing *Catanzaro*, 140 F.3d at 91).  As the record presently

exists, there is a genuine issue of fact regarding procedural due process.

**B.   Substantive Due Process**

"To make out a case for a substantive due process violation, a plaintiff must demonstrate

that: (1) he had a valid property interest; and (2) defendants infringed on that property right in an

arbitrary or irrational manner." *Cine SK8*, 507 F.3d at 784.   A decision can only be considered

arbitrary where it had no basis in fact.  *Gavlak*, 2005 WL 1828750, at *3 (citing *Natale v. Town of

Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999)).  Plaintiff must establish that the government action

transgresses "the outer limit" of legitimate government action and that the officials actions were

"shocking, abusive, capricious or arbitrary".  *Cathedral Church of the Intercessor v. Inc. Vill. of

Malverne*, 353 F.Supp.2d 375, 385 (E.D.N.Y. 2005).  A zoning board's actions can be

characterized as arbitrary or irrational "only when the government acts with 'no legitimate reason

for its decision'". *Crowley v. Courville*, 76 F.3d 47, 52 (2nd Cir.1996) (internal citations omitted).

Plaintiffs cite to a pattern of abuse and harassing behavior by defendants including

defendants repeated use of unscheduled inspections to intimidate and silence plaintiffs.

Plaintiffs claim that the Sanctuary was used as a forum for criticism of the City of Troy and the

egregious conduct officials supports a substantive due process claim.  Defendants claim that their

actions were related to a legitimate government interest and thus, were constitutional.

The record reveals that in January 2007, defendants performed an unannounced inspection

within weeks after the Sanctuary hosted an event criticizing the Mayor.  After that inspection,

plaintiffs received a letter detailing eight instances of non-compliance with the Building Code.

On March 10, 2008, the morning of the Bilal event, defendants performed another unannounced inspection.  Viewing the evidence in a light most favorable to plaintiffs, there is an issue of fact with respect to whether defendants acted arbitrarily and irrationally.   Defendants have not met their burden of proving that there was a legitimate reason to close the building for public assembly after the Bilal exhibit.  Accordingly, defendants' motion for summary judgment and dismissal of plaintiffs' due process claims is denied.

## VI.     Municipal Liability

Defendants argue there is no evidence to support plaintiff's claim that Mirch or the City of Troy implemented an official policy of "retaliation by code enforcement".  Further, defendants claim that Reeves, not Mirch had final policymaking authority with respect to life safety issues related to City Engineering and Code Enforcement.

Municipal liability can be established by a plaintiff (1) by demonstrating an official policy or custom of the municipality, or (2) by showing that a municipal "policymaker" violated plaintiff's constitutional rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978));
*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  "A municipality will not be held liable under § 1983 unless plaintiffs can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Monell.* 436 U.S. at 690.  With respect to the custom or policy, plaintiff must demonstrate a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation",  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989), and that the municipal policy was the "'moving force [behind] the constitutional violation.'"  *Id.* at 389 (quoting *Monell*, 436 U.S. at 694).  Moreover, the Supreme Court has held

that municipal liability attaches where the decision maker possesses final authority to establish

policy with respect to the action ordered and where a deliberate choice to follow a course of

action was made from among various alternatives by the official.  *See Pembaur*, 475 U.S. at 469.

"Even one episode of illegal retaliation may establish municipal liability under § 1983 if ordered

by a person whose edicts or acts represent official city policy." *Gronowski v. Spencer*, 424 F.3d

285, 296 (2d Cir.2005)

        Based upon the record, the Court is unable to conclude, as a matter of law, that Mirch did

not have final policymaking authority.  Mirch was the Commissioner of Public Works.  Plaintiffs

claim that the Troy City Code grants the Commissioner of Public Works, "the supervision and

control of . . . the Bureau of Code Enforcement".[11]  Albano testified that code enforcement

"comes under the Department of Public Works".  Further, Sheeran testified that Mirch was, "the

go-to guy.  He oversaw the whole thing.  When he came in, he changed policy."  Sheeran testified

that he understood that he had to follow Mirch's policies.  Despite defendants' argument that

Reeves had the decision making authority, the evidence sufficiently establishes that Mirch, as

Commissioner, was vested with the authority, supervision and control over the Bureau of Code

Enforcement.  A reasonable jury could conclude, based upon Mirch's title and position, that he

was an official with final decision-making authority and that he could have caused or contributed

to the constitutional violations.  *See Sebast v. Mahan*, 754 F.Supp.2d 423, 433 (N.D.N.Y. 2010)

(a reasonable jury could find that the actions or omissions of the sheriff contributed to freedom of

speech violations).  The Mayor of the City of Troy, Harry J. Tutunjian acknowledged that the

Charter provided the Commissioner of Public Works with jurisdiction over Code Enforcement

and the City Engineer, but claimed that was not the way the City operated.  Moreover, Reeves and

---

[11] Plaintiffs cited to the Charter in their opposition brief.  The record does not contain a copy of the Charter in proper evidentiary form.  However, defendants concede that the Charter grants the Commissioner such authority.

Mirch testified that Reeves had the final policymaking authority.   This self-serving deposition testimony does not warrant judgment as a matter of law or provide a basis for summary judgment on this issue. While the burden of demonstrating that Mirch was the final policymaker will rest with plaintiffs, on summary judgment, defendants have failed to show the absence of a genuine issue of fact regarding Mirch's policymaking authority.  *See Capasso v. Metro. Transp. Auth. of State of N.Y.*, 198 F.Supp.2d 452, 464 (S.D.N.Y. 2002) (the defendant did not submit proper evidence that he delegated his authority to another co-worker).

Plaintiffs have also presented sufficient evidence on the motion establishing that the City had a practice of conducting unannounced inspections of plaintiffs' building within close temporal proximity to events that questioned or criticized local government.   Pierce testified that someone from the City called in January 2007 and asked to come and inspect the premises "a few weeks" after plaintiffs held an event where people criticized the Mayor of Troy.   Pierce also testified that another inspection took place on March 10, 2008, the day of the Bilal event.  Pierce testified that he received a phone call from Albano who said, "he wanted to inspect us.  And I said when.  And he said right now".   Viewing the evidence in a light most favorable to plaintiffs, the Court denies defendants' motion for summary judgment on this ground.


**VII.    Qualified Immunity**

Defendants argue that Mirch is entitled to qualified immunity against the § 1983 claims.[12] Qualified immunity shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly

---

[12] Defendants also argue that Reeves is entitled to qualified immunity.  However, Reeves is not a defendant in the action.

established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even where a right is clearly established, an official is entitled to qualified immunity nevertheless if "it was objectively reasonable for the public official to believe that his acts did not violate th[at] right[ ]." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991). However, the objective reasonableness of a defendants' actions depends at least in part on their alleged motivation in dealing with plaintiff, therefore, an adjudication as to the applicability of the qualified immunity affirmative defense on the basis of the pleadings alone would be premature. *Vega v. Artus*, 2009 WL 838124, at * 17 (N.D.N.Y. 2009).

The only remaining constitutional claim is a violation of plaintiffs' due process rights. "It is well settled that enforcement of an otherwise valid zoning ordinance violates the Constitution . . . if . . . the decision of the particular zoning body is arbitrary, ... or if the ordinance is applied or enforced with a discriminatory intent or purpose." *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988) (citation omitted) (the appellees were not entitled to claim the defense of qualified immunity in the event that they are found to have violated the appellants' fourteenth amendment rights).

Having carefully considered the present record, the Court is not well-positioned at this stage to dismiss plaintiffs' Due Process claims on the basis of qualified immunity. Rather, the Court finds that "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F.Supp.2d 659, 666 (S.D.N.Y. 2004).

**VIII.    State Claims**

**A.        Plaintiffs' Rights under Article I of the New York State Constitution**

"Free speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment." *Carter v. Inc. Vill. of Ocean Beach*, 693 F.Supp.2d 203, 212 (E.D.N.Y. 2010) (citing *inter alia*, *Housing Works, Inc. v. Turner*, 179 F.Supp.2d 177, 199 n. 25 (S.D.N.Y. 2001), *aff'd sub nom. Housing Works, Inc. v. Guiliani*, 56 F.App'x 530 (2d Cir.2003).  Accordingly, defendants' motion seeking summary judgment dismissing plaintiffs' free speech retaliation claim based upon the New York State Constitution (third cause of action) is GRANTED.

**B.        Abuse of Process**

Defendants seek summary judgment and dismissal of plaintiffs' fourth cause of action arguing that there is no evidence of improper use of civil process.   "In order to state a claim for abuse of process, a plaintiff must establish that the defendants had an improper purpose in instigating the action.... '[I]mproper motive is not enough'".  *Conte v. County of Nassau*, 2010 WL 3924677, at *20 (E.D.N.Y. 2010) (quoting *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924)).  Defendants argue that, "the record establishes that the Notice of Violation was issued for a lawful and justified purpose".  As this Court previously noted, there are factual issues that must be resolved surrounding the issuance of the Notice of Violation.  Viewing the evidence in a light most favorable to plaintiffs, defendants' motion for summary judgment on this claim is DENIED.

**IX.      Punitive Damages against Mirch**

Punitive damages under § 1983 are only recoverable against the individual defendants in their individual capacities "when the defendant's conduct is shown to be motivated by evil motive

or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  *Doolittle v. Ruffo*, 1996 WL 159850, at *43 (N.D.N.Y. 1996) (citing *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991)); *Smith v. Wade*, 461 U.S. 30, 56 (1983).  "The issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct'".  *Smith,* 461 U.S. at 52. Accordingly, defendants' motion for summary judgment on this issue is DENIED.


### CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part as follows.

It is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No.33 ) dismissing plaintiffs' First Amendment retaliation claims is **GRANTED**; it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' Equal Protection claims is **GRANTED**; it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' Due Process claims is **DENIED**; it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' third cause of action for relief pursuant to the New York State Constitution is **GRANTED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' fourth cause of action is **DENIED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' punitive damages claim against Mirch in his individual capacity is **DENIED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 33) dismissing plaintiffs' complaint is otherwise **DENIED**; and it is further

**ORDERED** that a Settlement Conference is scheduled in this matter for October 6, 2011 at 10:00 AM.  The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference.

**IT IS SO ORDERED.**

Dated: August 2, 2011
       Albany, New York


Mae A. D'Agostino
U.S. District Judge